DOWNEY, Judge.
This is an appeal from a final judgment upholding a tax assessment on real property in Palm Beach County. Appellants, the property owners, sued Rebecca E. Walker, the county property appraiser, and Allen C. Clark, the county tax collector, contesting the 1982 tax valuation of $1,042,500 assessed against approximately fifty-one acres of unimproved property owned by them in the City of West Palm Beach. The owners’ complaint alleged that they successfully sought administrative relief from said assessment by petitioning the Palm Beach County Property Appraisal Adjustment Board, where the assessment was reduced to $765,000. The property appraiser accepted the board’s assessment, but the owners, being dissatisfied with the reduction, sought relief in the circuit court. The trial court found that the owners had failed to meet their burden of proof to overturn the assessment and entered judgment for the property appraiser and tax collector, and the owners perfected this appeal.
The property in question is “L” shaped and has a ten-acre lake at the south end. It is located adjacent to St. Mary’s Hospital and the Royal Palm Memorial Gardens Cemetery, which is also owned by appellants. The east end of the property fronts Old Dixie Highway and the north side of the property is adjacent to a series of Florida Power and Light electricity transmission lines. A portion of the property is spanned by a row of power lines pursuant to easements owned by Florida Power and Light. Under the City of West Palm Beach *1095 Zoning Code Section 53-21, the property is zoned “P” Parks District.[1]
The City of West Palm Beach has adopted a comprehensive land use plan pursuant to Chapter 163, Florida Statutes. Under that plan the property in question is shown in an area designated “Community Service.” While the plan does not contain a formal definition of community service, there is a definition in the minutes of the Planning Board Case No. 677 where the board requested that a definition of community service be added to page ninety-one of the plan.[2]
The owners’ appraiser valued the land at $163,000 based on twenty-three usable acres. He found numerous factors which denigrated the value of the overall property, such as: the Florida Power and Light easement, which involved some high tension lines that spanned a portion of the property; the proximity to a cemetery; the property was located in a high crime area; and the existence of a ten-acre lake located on the south end of the tract.
The property appraiser’s expert, Mr. Stahman, valued the property at $1,130,000 based on forty-one usable acres. He testified that he considered each of the eight criteria found in section 193.011, Florida Statutes, in arriving at the just value of the property. Regarding the criteria of “[t]he highest and best use to which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration any applicable local or state land use regulation ...,” section 193.011(2), he stated that his “opinion was based on the permitted uses and the current zoning which is applicable to the subject property.” Further, he considered the highest and best use of the property to be one of those permitted under the community service classification of the comprehensive land use plan, and he stated that what is presently permitted under the “P” zoning designation would be private and semi-private types of uses subject to approval by the city commission. Mr. Stah-man testified that government buildings could be placed on property in the “P” zoning, and that golf courses and institutions (such as schools and churches) could be constructed in the “P” zoning once approvals were obtained from the city commission. Although he recognized that a life care facility would not be a permitted use under the “P” zoning, he stated that, based upon his discussions with the city zoning director, there was a favorable possibility that the city commission would approve use of the property for a residential life care facility in light of the community service designation under the land use plan. Under the plan, there was a determination that a major medical facility should be located in the vicinity of the subject property. Additionally, Mr. Stahman determined that there was a demand for other uses of the subject property. He stated that there was a demand for school sites in the area, and that the school board had purchased property nearby for use as the *1096 relocation of Twin Lakes High School. He pointed out that Scripps-Howard was proposing to expand its existing broadcast facility and to construct an additional new facility, and that Channel 29 is newly located on the south side of Blue Heron Boulevard. He also stated that there was a drug and alcohol user’s rehabilitation center under construction near the property, at St. Mary’s Hospital.
With regard to the detrimental factors which the property owners’ expert described, Mr. Stahman found their impact on value either nonexistent or disagreed with many of them. He testified that he considered the allegation that the property was located in a high crime area, noting that a nearby facility had only had five criminal incidents in the past five years. He opined that it would be possible to provide sufficient on-site security for any development on the property to overcome any adverse influence caused by crime in the neighborhood. As to the allegation that the lake would require substantial land fill, Mr. Stahman stated that the trend of today’s market development procedures is to have on-site retention for water runoff and, therefore, the lake could easily serve this purpose. Regarding the power lines over a portion of the property, Mr. Stahman did not believe that they would have to be moved, and that the area underneath could be used for purposes such as parking, landscaping and “heart trails.” It should also be noted that Mr. Stahman properly considered the value of Florida Power and Light’s easements in his appraisal of the property, whereas the owners’ expert did not.[3] Finally, Mr. Stahman did not think that the location of the property next to the cemetery had a negative influence on its value.
Thus, the bottom line is that the property owners contend that the fair market value of the property (only twenty-three acres) is $8,500 per acre, which they discounted to $163,000, whereas the board of adjustment’s valuation of the property is $15,000 per acre, or a total of $765,000 for fifty-one acres.
On appeal the owners never discuss the valuation of $765,000 set by the board— they discuss only the valuation set* by the property appraiser’s witness at $1,130,000. However, since the property appraiser did not contest the board’s valuation, the board’s valuation became the property appraiser’s valuation for the taxable year in question. Furthermore, that valuation carries the same presumption of validity as is usually accorded the property appraiser’s valuation. Bystrom v. Equitable Life Assurance Society, 416 So.2d 1133 (Fla. 3d DCA 1982).
The property owners’ first point on appeal is that the property appraiser’s valuation is unacceptable because it disregards the present zoning on the property and relies on uses available under the comprehensive plan. The owners contend that the valuation must be based on the existing zoning, which in this case is “P” Parks District, allowing only the uses described in footnote one. Under that restriction, the owners argue, the property cannot be used for any of the more liberal uses described in the community service use provided in the comprehensive plan. Relying on City of Jacksonville Beach v. Grubbs, 461 So.2d 160 (Fla. 1st DCA 1984), the owners claim that, because the “P” zoning is more restrictive than the comprehensive plan, the property appraiser is not free to take into consideration the varied uses available under the plan.
The Grubbs case does recognize that the present use of land may, by zoning ordinance, continue to be more limited than the future use contemplated by the comprehensive plan, and that, when such a plan offers no guidance or timetable as to when to conform more restrictive zoning ordinances with the plan, it is a legislative judgment to be made by a local governing body. However, that case does not indicate that it *1097 would be error for a property appraiser to consider a comprehensive plan in determining the value of real property. Furthermore, Grubbs is factually distinguishable from the instant case. In Grubbs, the trial court’s finding regarding the highest and best use of the property, which took into consideration the plan, was irrelevant because the court was reviewing a decision of the zoning authority, not a property appraiser’s tax assessment. In order to overturn a zoning authority’s discretionary decision denying a request for rezoning, the burden is on the property owner to show that the zoning imposed deprives his property of all beneficial use. In the instant case, the burden was on the property owners/taxpayers to show that the property appraiser or the board did not consider the relevant criteria in section 193.011, Florida Statutes, in reaching the assessment. See, e.g., Bath Club, Inc. v. Dade County, 394 So.2d 110 (Fla.1981) (Taxpayer alleged that appraiser improperly considered a zoning ordinance that would allow a higher and better use for the property. The court held that the taxpayer’s disagreement on the weight to be accorded use restrictions and zoning was simply not a sufficient basis to upset the appraiser’s determination).
In the instant case, the property appraiser’s expert testified that he considered all of the relevant assessment considerations set out in section 193.011. The property appraiser’s expert simply recognized, in determining the highest and best use of the property, that the existing zoning would permit many uses consistent with the plan, once the commission approvals were obtained, and that there was presently a demand for uses designated under the plan.
We concede that generally land is to be valued considering the present zoning applicable thereto. However, based on this record, we do not believe the property appraiser was precluded from also considering the uses authorized under the comprehensive plan, particularly in the light of the legislative purposes set forth in the Comprehensive Land Use Act and the evidence regarding the city commission’s attitude toward development in accordance with the comprehensive plan. Mr. Lozito, the city building inspector, testified that, as between the comprehensive plan and the present zoning, the city commission put the uses allowed by the comprehensive plan ahead of the zoning. It therefore appears that the city’s attitude toward development in the area is consistent with the goals and purposes of the Comprehensive Land Use Act, which provides in section 163.3194(1), Florida Statutes (1981):
After a comprehensive plan or element or portion thereof has been adopted in conformity with this act, all development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element shall be consistent with such plan or element as adopted. All land development regulations enacted or amended shall be consistent with the adopted comprehensive plan or element or portion thereof.
The evidence in this case shows that the area which includes the property in question presently contains a hospital and a drug rehabilitation center, and that there is a present demand for other uses such as school sites, a broadcast facility, and possibly a residential life care facility. Thus, without denigrating the importance of the present zoning on this property as a factor in valuation, the property appraiser also considered another valid factor in determining present fair market value, i.e. the potential future use to which a piece of property is presently adaptable and which creates a present market demand. Bystrom v. Valencia Center, Inc., 432 So.2d 108 (Fla. 3d DCA 1983) (citing Williams v. Simpson, 209 So.2d 262 (Fla. 1st DCA 1968), and Dade County v. The Miami Herald Publishing Co., 285 So.2d 671 (Fla. 3d DCA 1973)).
The property owners’ second point is that the property appraiser’s valuation is grossly excessive. As we pointed out in the recitation of the factual background of the case, the property appraiser initially fixed the value of the property at $1,042,- *1098 500, then, following a hearing before a special master appointed by the board of adjustment, the board lowered the assessment to $765,000. The burden on the property owners in the trial court, and here, is set forth in Bystrom v. Equitable Life Assurance Society, 416 So.2d 1133, 1143 (Fla. 3d DCA 1982), which held the owners must demonstrate:
(1) that the Board did not render a proper re-evaluation because the presumptive validity of the initial assessment was not overcome; (2) the Board did not consider the relevant criteria in reaching its reevaluation, and thus its re-evaluation was vitiated, or a combination of (1) and (2); or (3) the presumptive correctness of the Board’s re-evaluation was overcome by evidence which excludes every reasonable hypothesis of a legal assessment.
In our judgment, the evidence adduced below fails to make any such demonstration. On the contrary, the trial court could well have found that the property appraiser considered all of the statutory criteria set forth in section 193.011, Florida Statutes, which together with other evidence in the record supported the board of adjustment’s valuation. At most the property owners’ case simply differs with the property appraiser’s conclusion as to value. That, of course, is not sufficient to carry the day. Keith Investments, Inc. v. James, 220 So.2d 695 (Fla. 4th DCA 1969).
Accordingly, we affirm the judgment appealed from.
WALDEN, J., concurs.
WESSEL, JOHN D., Associate Judge, dissents with opinion.

. Section 53-21 "F’ Parks District provides:
1. Private Use. No private structure or private business operation shall be permitted or carried on unless and until approval therefor shall have been granted by the City Commission.
2. Public Use. All such property shall be open to the public for public and semi-public uses in accordance with law under the supervision of the Parks and Recreation Commission of the City, subject to the general control and direction of the City Commission.

. The definition to be added to page 91 of the plan provides:
6. Community Service. — Areas within which only public or semi-public facilities and institutions are permitted. Public or semi-public facilities and institutions include only government buildings, educational institutions, hospitals and medical centers, cultural and recreational facilities and parks, cemeteries and radio and television stations. Prohibited uses are residential, general office and industrial. Administration — Areas designated as "Community Service” on the Future Land Use Plan will allow the following uses: government buildings, institutions of a religious, educational, eleemosynary, or philanthropic or similar nature, hospitals and medical centers, cultural and recreational facilities and parks, cemeteries and radio and television stations. The following uses will be prohibited: multi family and single family residential, commercial, general office and industrial.

. According to our decision in Century Village v. Walker, 449 So.2d 378 (Fla. 4th DCA 1984), the assessment must include all interests in the property together, or the "whole bundle of rights" in the property.